2023 IL App (1st) 210797-U

Fourth Division
Filed November 16, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(a).

No. 1-21-0797

---

## IN THE
## APPELLATE COURT OF ILLINOIS
## FIRST DISTRICT

---

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | Appeal from the |
| Plaintiff-Appellee, | Circuit Court of Cook County |
| *v.* | No. 14 CR 1922 |
| TAFT HAYDEN JR., | The Honorable Carl Boyd, |
| Defendant-Appellant. | Judge, presiding. |

---

JUSTICE OCASIO III delivered the judgment of the court.
Justice Hoffman and Justice Martin concurred in the judgment.

## ORDER

¶ 1     *Held*: We affirm defendant's conviction and sentence for first degree murder over his contentions that the trial court erred when it admitted certain evidence pursuant to the forfeiture-by-wrongdoing doctrine and improperly relied on a factor inherent in the offense at sentencing. We agree with the parties that the court erred when imposing a five-year term of mandatory supervised release and correct the mittimus to reflect a three-year term.

¶ 2     Following a bench trial, defendant Taft Hayden Jr. was found guilty of first degree murder and sentenced to 25 years in prison. On appeal, Taft[1] contends that the trial court erred when it admitted certain evidence pursuant to the forfeiture-by-wrongdoing doctrine and by considering a factor inherent in the offense at sentencing. He further contends that the trial court improperly imposed a five-year term of mandatory supervised release (MSR), when the statutorily mandated

---

[1] To avoid confusion, we will refer to the members of the Hayden family by their first name.

MSR term is three years. For the following reasons, we affirm Taft's conviction and 25-year sentence for first degree murder and order his mittimus corrected to reflect a three-year MSR term.

¶ 3                                    BACKGROUND

¶ 4     Taft was charged by indictment with two counts of first degree murder alleging that on December 29, 2013, he struck and killed his wife, Mary Hayden, with a bludgeon.

¶ 5     On May 4, 2018, the State filed a motion seeking to admit certain of Mary's statements pursuant to the doctrine of forfeiture by wrongdoing. See Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011). The motion alleged that, after Mary decided to divorce Taft, their relationship deteriorated and he ultimately killed her. The motion noted that, although Taft stated in a 911 call that Mary had fallen and was not breathing, an autopsy concluded that Mary's injuries were not consistent with a fall and her death was caused by head trauma. The motion alleged that Taft killed Mary to prevent her from pursuing the divorce and testifying against him in those proceedings, rendering Mary's statements admissible pursuant to the doctrine of forfeiture by wrongdoing.

¶ 6     These statements included that, in September 2013, Mary told her friend Tina Estes-Eubanks that if something happened to Mary, Taft did it. Then, in December 2013, Mary told her mother, Dimple Wotten, that Taft refused service of the divorce papers, that he "didn't do divorces," and that Wotten should look at him should anything happen to her. That same month, Mary also told her sister Joyce Williams that Taft refused to accept the divorce papers. On a prior occasion, Mary told Williams to look at Taft if anything happened to her. Mary told her boyfriend, Bertran "Goldie" Murphy, that she was having problems with Taft, whom she described as "evil." She also told Murphy, "[I]f anything happens to me, look at Taft because he don't do divorces."

¶ 7     A few weeks before her death, Mary told her friend Hillary Holmes that Taft locked himself in a room when a process server came to the residence and that Mary believed she should obtain

life insurance because she would rather be safe than sorry. Also, in the months prior to her death, Mary told her friend Shayla Jarvis that Taft was not taking the divorce well. Mary wanted to give Jarvis personal information in case anything happened to her, and she told Jarvis that, if anything did happen, it would be her husband. Mary told another friend, Debra Appleby, that Taft was verbally abusive and very controlling. Mary also told Appleby that, after she filed for divorce, Taft made a threat that, if the divorce happened, something would happen to her.

¶ 8 Mary told her coworker Bianca Butler that Taft did not believe in divorce and she would only leave him in death. She told another coworker, Romerio Lucas, that Taft did not want the divorce and was verbally abusive. On several occasions, she told Lukas to look at Taft if anything happened to her. She also told Lucas that she was not sure what Taft would do.

¶ 9 The State also sought to admit portions of Mary's diary dated to the last months of 2013. On October 22, Mary wrote that Taft received a letter from her attorney and told their children that she was leaving them. On November 9, she wrote that Taft did not contribute to their daughter's birthday and said that "his money looks better in his own pockets." On November 12, she wrote that she told her family about the divorce "in the event Taft decides to harm me because I'm divorcing him." On December 7, she noted that Taft had refused the divorce papers from the process server. On December 17, Mary wrote that she cancelled Taft's bank card because she was tired of paying all the bills and he did not contribute. Photocopies of the diary entries were attached to the motion.

¶ 10 On September 20, 2018, the trial court held argument on the motion. The State argued that the forfeiture-by-wrongdoing doctrine permits the admission of statements by a declarant when the defendant procured the declarant's absence by wrongdoing in order to prevent the declarant from testifying against the defendant in a legal matter. The State argued that Taft killed Mary

because he did not want the divorce, highlighting her statements to multiple people expressing concern that Taft would do something to her and that if something happened to her, people should "look at" Taft.

¶ 11    Thereafter, according to the State, Taft called 911 stating that Mary fell, but an autopsy concluded that her injuries were inconsistent with a fall and her death was caused by blunt head trauma. The State asserted that it did not have to show that the statements were reliable as, under the doctrine of forfeiture by wrongdoing, Taft forfeited challenges the statements' reliability. Rather, it was for the trial court to determine whether the statements were relevant.

¶ 12    The defense argued that someone else could have entered the home and committed the offense and that Taft was never actually served in the divorce proceeding. The defense further objected to the diary's foundation, as no one was "qualified" to state that Mary wrote it.

¶ 13    The trial court granted the State's motion, finding that the State proved, by a preponderance of the evidence, that Taft procured Mary's unavailability with the intent to prevent her from testifying in the divorce proceeding.

¶ 14    The defense immediately moved to reconsider based on the foundation for the evidence, particularly whether Mary wrote the diary entries and whether they were actually written on the corresponding dates. The State responded that, if Mary had been alive, she could have testified regarding her thoughts on those days. The trial court denied the defense's motion.

¶ 15    At trial, Williams testified that Mary and Taft were married for at least 11 years and had two children who, at the time of trial, lived with their maternal grandmother. Williams and Mary regularly spoke on the phone. In May 2013, Mary was arrested for alleged child abuse. Thereafter, Mary was concerned that Taft had her arrested and she expressed a desire to leave the marriage. Williams, who worked for a bar association, told Mary that she could refer her to divorce attorneys

when she was ready to "seriously" pursue a divorce. Williams also recommended that Mary begin keeping a journal.[2] In September 2013, Williams learned that Mary had started dating Murphy.

¶ 16 In December 2013, Mary told Williams during a phone call that a process server was trying to serve Taft with the petition for dissolution of marriage but Taft was refusing to accept it and had closed himself off in an office.

¶ 17 A few weeks before Mary filed for divorce, Mary told Williams during a phone call that Taft had said to her that he did not do divorce. Although Mary was unconcerned about her safety, Williams told her that she was welcome at Williams's home any time. Williams believed that, as of December 29, 2013, Mary was still sleeping in the master bedroom of her own home, although she occasionally slept in a bunk bed in her son's room.

¶ 18 Following Mary's death, on December 30, 2013, Williams went to Mary's residence to retrieve clothing for the children. When Williams returned the following day to obtain an outfit for Mary to be buried in, she found only a jacket, a blouse, and shoes. The rest of Mary's clothing was gone. Mary's family intended to cremate Mary, but she was interred because Taft did not approve the cremation paperwork. The family paid for the funeral and Taft paid for the casket and burial.

¶ 19 Williams identified certain pages that bore Mary's handwriting. Williams recognized Mary's handwriting because they were sisters for 42 years. However, she was unsure whether she had ever seen these particular pages before, as Mary kept two journals.

¶ 20 During cross-examination, Williams testified that she did not see Mary at Christmas as Mary, Taft, and their children did not celebrate the holiday "because of" Taft. Williams testified

---

[2] At this point, the trial court noted that portions of Williams's testimony could be subject to hearsay objections and that the court previously ruled that these statements were admissible pursuant to the doctrine of forfeiture by wrongdoing. Trial counsel asked the court for a standing objection, which the court granted.

that Mary wanted to end the marriage due to Mary's arrest in May 2013 and the accusation that she was "whipping" the children. Willams testified that the police recovered one of Mary's journals, which was the source of the pages the State previously showed her. She believed that the journal, which she had not seen before, had been found in Mary's office. Williams recovered a second journal, which was "only about five or six pages," from Mary's vehicle and gave it to the State approximately 5½ years prior to the trial. The dates in the second journal were from July 2013, and one entry dealt with funds that Taft removed from a joint account that were needed for bills.

¶ 21    Williams and Taft did not speak much and never discussed Taft and Mary's marriage. They last spoke when Mary appeared in court due to the child abuse proceeding. Taft asked Williams if she thought the children "being whipped" was a good idea, and Williams responded that he was speaking to the wrong person. At trial, Williams explained that Mary took steps that she believed were appropriate after the children left home without permission. Taft did not indicate to Williams that he was aware of Mary's relationship with Murphy.

¶ 22    Jarvis, Mary's coworker, testified that they discussed personal matters and socialized outside work. After Mary was arrested, Mary began to wonder if her marriage would not "work out" and indicated that she and Taft separated. In December 2013, Mary stated that a process server put the divorce papers under the door of the room where Taft had locked himself. Mary also stated that she did not think that Taft believed in divorce. About 1½ weeks before her death, Mary stated that, if anything happened to her, Taft "did it" and that there was a box in the office for her family. During cross-examination, Jarvis denied telling anyone what Mary said, but acknowledged speaking to officers when they came to the office.

¶ 23    Appleby, another coworker, testified that, in December 2013, Mary stated that Taft "indicated that the only way she would get her divorce was to be carried in a bag," that is, he would kill her. Appleby told Mary not to take Taft's threat lightly and asked whether she was concerned. Mary replied, "very."

¶ 24    Lucas testified that he and Mary worked together and socialized. During conversations in 2013, Mary indicated that she was planning to file for divorce and then did so. During another conversation, Mary stated that Taft did not want a divorce.

¶ 25    Attorney Kevin Saville testified that Mary retained him on October 16, 2013, to represent her in the divorce. Saville mailed a letter to Taft, stating that he should decide whether to represent himself or retain an attorney and then contact Saville. The letter included a "waiting period." After that period, Saville drafted a petition for dissolution of marriage, which Mary reviewed and signed. Saville then gave the paperwork to special process server Rich Sylvester, who went to Mary and Taft's residence to serve the papers. The petition was filed in the circuit court of Cook County on November 19, 2013. On December 7, 2013, Sylvester told Saville that the papers were served. On December 30, 2013, Saville learned that Mary was dead.

¶ 26    Saville was never contacted by Taft or his attorney. He explained that, if he is not contacted after a respondent is served, he files a motion for default and a court date is set 30 days after service of the motion. The next court date in Mary's case would have been around January 7, 2014.

¶ 27    During cross-examination, Saville testified that during their initial phone conversation, Mary did not "directly" state that she feared Taft or that he threatened her. Mary reviewed the dissolution petition, which initially alleged irreconcilable differences, or in the alternative, physical and mental cruelty. She was "adamant" that the phrase "physical cruelty" be removed because it would "set him off." Mary contacted Saville on November 4, 2013, to state that Taft

received the letter. On December 17, 2013, after Mary stated Taft was not paying half of their expenses and had removed half the funds in a joint bank account, Saville advised Mary to open her own accounts.

¶ 28    During redirect, Saville testified that in the petition for dissolution of marriage, Mary sought custody of the children, child support, and maintenance. Once a petitioner dies, the dissolution proceeding ends.

¶ 29    Sylvester testified that Saville requested that he serve the petition for dissolution on Taft. On December 7, 2013, he went to a residence in Country Club Hills. Before entering, he heard arguing. Mary let Sylvester inside and stated that Taft was in the bathroom. Sylvester did not see Taft. Saville and Mary spoke to the person in the bathroom, who never opened the door. Saville slid the summons under the door and heard the person inside tell Mary that he was not coming out.

¶ 30    Norman Boyd, a Country Club Hills lieutenant firefighter and paramedic, testified that, on December 29, 2013, around 8:18 a.m., he was dispatched to a residence in the 4500 block of West 179th Street for an "unresponsive fall victim." When he arrived, Taft was in the driveway and stated that "she" was inside. Boyd saw a naked woman on the ground in the foyer. A section of a broken pillar was on the woman's body, her eyes were swollen shut, and fluid was exiting one ear. Based upon the woman's condition and his experience, Boyd "immediately felt" that she had not fallen, so he walked outside and radioed for police officers.

¶ 31    During cross-examination, Boyd testified that the front door was open when he arrived. The woman "did not look to be alive," and he did not remember if he checked for a pulse. He knew the residence was a crime scene, so he contacted the police and told the ambulance crew to be careful. He was inside for less than a minute, and he did not remember if there were towels underneath the woman or if the pillar on top of her was bloodstained.

¶ 32    During redirect, Boyd acknowledged that he spoke to an investigator on December 29, 2013, and stated that he checked for a pulse, saw that the woman's eyes were swollen shut, and that there was "a lot" of blood.

¶ 33    Country Club Hills lieutenant paramedic Nicholas Jula testified that he arrived at the residence just after Boyd and observed a person in front of the house on a phone.[3] This person then entered the residence. When Jula entered the residence, he observed a scene that was "unusually chaotic-looking" for a fall. The position of the patient did not make sense "anatomically." There was a concrete column on top of the patient, her eyes were swollen shut, and there was facial trauma, gray matter exiting one ear, and blood spatter on the wall. Jula found the scene "highly suspicious" for a fall, having never seen "something like that" in his 19-year career. He had seen similar facial trauma in vehicle accidents.

¶ 34    Jula checked the patient's neck for a pulse, but did not find one. She was extremely cold to the touch and exhibited signs of death. Jula found that unusual, as fall victims were sometimes alive for several days before rescue personnel found them and sometimes patients were warm or had "viable life" even when it was cold outside. Jula exited the residence and stopped other personnel from entering until the police secured the scene. Personnel then went back inside and used EKG leads to confirm no pulse, respiration, or blood pressure. The scene was turned over to the police.

¶ 35    During cross-examination, Jula testified that he checked the patient's pulse, but did not remember whether he applied the EKG leads. Cardiac pads were put on immediately to determine whether there was a shockable rhythm. Then the police secured the scene. Emergency personnel

---

[3] Jula testified that he had the rank of engineer paramedic on December 29, 2013.

returned and applied the EKG leads. The patient was located three feet inside the tiled foyer, and beneath debris from a concrete pillar. The pedestal, which was on the patient's shoulder, was moved so that the EKG leads could be applied. Jula did not remember injuries to the back of the skull. As the husband walked away, Jula asked what happened. The husband acted like he did not care, and asked, "oh, is she okay?" Jula felt that response was inappropriate, considering the circumstances.

¶ 36    Edward McKinney testified that he previously worked as a detective at the Country Club Hills Police Department. On December 29, 2013, he was called to a residence on West 179th as part of a death investigation. After viewing the scene and speaking to officers, McKinney contacted the South Suburban Major Crimes Task Force. Upon returning to a police station, he met Taft. Later, McKinney went to the residence to retrieve a "black book" containing written notes and brought it to the police station. At trial, he identified the item as Mary's journal. On December 31, 2013, pursuant to a search warrant, he obtained buccal swabs from Taft. The same day, he met with Williams, who gave him copies of Mary's "journal." After reviewing these pages, McKinney determined that he had the "original" journal. He made copies of the pages and then returned them to Williams.

¶ 37    During cross-examination, McKinney testified that he was never given a second journal. Williams stated that she kept the diary pages out of concern for Mary's safety. Taft's fingernails were swabbed. During the investigation, McKinney learned that two children were present in the residence at the time of Mary's death. He did not speak to the children.

¶ 38    Crestwood police sergeant Mike Alexander testified that as part of this investigation, he requested the Majestic Star Casino in Indiana search its footage to determine Mary's movements. Alexander retrieved the footage on December 31, 2013.

¶ 39    The parties stipulated to the introduction of video recordings depicting Mary at the Majestic Star Casino from the night of December 28 and the early morning of December 29, 2013, was recorded and then onto a CD. The State published the time-stamped video, which Alexander narrated. Alexander identified Mary, who was wearing a red shirt, enter the casino at 8:52 p.m. on December 28, cash out at 2:20 a.m. on December 29, and exit the garage at 2:33 a.m.

¶ 40    This footage is included in the record and this court has viewed it. There are numerous clips of an African-American woman wearing a red and gold jacket and dark pants. These clips depict her entering, moving about, and exiting the casino, entering a vehicle in a parking garage, and that vehicle exiting the garage and driving away on a surface street.[4]

¶ 41    During cross-examination, Alexander testified that the footage depicted Mary arriving at the casino alone. He did not know if she met someone. She was alone when she walked to her vehicle, but Alexander did not search the footage to determine if someone walked ahead of her.

¶ 42    Taft's cousin Demarrion Wilson testified that he and a female companion arrived at the Majestic Star Casino around 10 p.m. on December 28, 2013, and encountered Mary. The two women then gambled. Wilson believed Mary had a cocktail, but did not remember how many. When Wilson and his companion left, Mary remained. Around 2 a.m., on December 29, 2013, he responded to Mary's text stating she won money. He texted Mary between 7 a.m. and 8 a.m., but she did not respond. Wilson did not know how Mary arrived at the casino, whether she was with someone, or who else she encountered.

---

[4] Several clips are so blurry that it is not clear whether the woman is present, and the majority of the clips are blurry such that only the top half of the image (or less) is discernable and the timestamps are not visible.

¶ 43     The parties then stipulated to a recording of a 911 call made at 8:17 a.m. on December 29, 2013, from Mary and Taft's residence to the Country Club Hills Fire Department. The 911 call was published. It is included in the record on appeal and this court has listened to it.

¶ 44     In the call, the operator states "911 emergency." A man gives an address, asks for an ambulance, and states that his wife fell and he has been trying to "wake her up." He asks, "can you get somebody [inaudible] to handle that." The operator repeats the address and that the woman fell and is unconscious. The man answers, "yes, she is unconscious." The operator then asks whether the woman is breathing. The man states, "no" and that a "column fell." He asks that someone come "over here real fast." The operator states that personnel are on the way and again asks whether the woman is breathing. The man replies, "it doesn't look like it." The operator repeats that the woman is not breathing, and the man confirms, "it doesn't look like it."

¶ 45     Cook County Sheriff's Police Department crime scene investigator Don Stewart testified that he photographed the residence. He identified photographs depicting the doors and windows which showed no forced entry. Stewart also photographed the victim, broken pedestals, and areas of the home where he observed blood. Stewart testified that photographs from the laundry room depicted "multiple" blood patterns on the exterior of the washing machine and the inner rim. Photographs of the master bedroom depicted a canvas bag and headboard with bloodstains. The bloodstains on the headboard and washing machine were swabbed. During cross-examination, Stewart testified that he did not swab the washing machine, the pedestals, the glass shards, or the glass backyard door for fingerprints.

¶ 46     Orland Park police commander Eric Rossi testified that, on December 30, 2013, he went to the Secret Service Office in Chicago to execute a search warrant on Mary's cell phone. A forensic examination was conducted on the phone, and all data on the phone, including call logs

and text messages, was downloaded. Rossi testified that this data showed that the last outgoing call was on December 29, 2013, at 3:37 a.m.[5] The last text message that had been read was received at 3:11 a.m. on December 29, 2013, and the last outgoing text message was sent at 3:49 a.m.

¶ 47    During cross-examination, Rossi testified that he did not take Taft's cell phone to be examined and did not ask other officers to do so. He conducted "other cell phone exams" in this case, but did not identify the owner of those phones. Rossi did not contact Mary's cell phone carrier and did not recall learning about Murphy.

¶ 48    Dr. James Filkins testified that, in 2013, he was an assistant medical examiner and performed Mary's autopsy. The autopsy revealed abrasions to the forehead, the left cheek, the nose, and the lips; lacerations to the forehead, the left ear, and above the left eyebrow; and bruising and swelling surrounding both eyes. There were bone fractures in the nose and left eye socket, bruising to the left shoulder, and superficial incised injuries to the right chest as well as numerous glass fragments in the buttocks and blood "flowing" from both ear canals. The internal examination revealed several subgaleal hemorrhages (bleeding between the scalp and the skull), fractures to the left frontal bone, multiple basilar skull fractures, and bleeding in the brain. Bite marks went through the tongue. Most of the injuries were oriented to the left side of Mary's head.

¶ 49    Filkins opined that Mary's injuries were not caused by falling two to three steps and striking her head. He had observed similar injuries that had been caused by being beaten with a blunt object, falling two or three stories onto a hard surface, and being in certain vehicle accidents. He concluded that Mary died due to brain and skull injuries caused by blunt head trauma.

---

[5] Rossi acknowledged that the time stamp read "9:37 and 16 a.m." He explained that this was Universal Time Code, which was "minus six to our time zone," *i.e.*, the Central Time Zone.

¶ 50    During cross-examination, Filkins testified that he did not measure the thickness or strength of Mary's skull. In his opinion, it was a normal skull. He acknowledged that Mary was obese and that a heavier person may generate more force when falling.

¶ 51    During redirect, Filkins testified that some of Mary's teeth were loosed from the bone, and that she had a broken nose and injury to the mouth, which was consistent with a punch to the face. A punch to the face could also have caused the blackening around the eyes and rendered her unconscious. Mary's fingernail clippings were obtained.

¶ 52    During recross-examination, Filkins acknowledged that he could not determine whether Mary was rendered unconscious by a punch to the face. Her injuries were also consistent with other possible causes.

¶ 53    Country Club Hills crime scene investigator Bonnie Jones testified that she swabbed pieces of a pedestal. During cross-examination, Jones testified this occurred nine months after the incident. She also inventoried the clothing Taft was wearing when he was arrested but was not instructed to send those items to the lab.

¶ 54    Illinois State Police lieutenant Rebecca Hooks testified that she focused on bloodstain pattern and analysis. Prior to her testimony, she reviewed Mary's autopsy report and photographs, police reports, crime scene photos, laboratory reports, a crime scene investigation report, and an "evidence manifest." Hooks opined that a stain at the foot the stairs was consistent with an "impact pattern." The source of the blood had been above floor-level, but not by more than one foot.

¶ 55    Hooks agreed that this observation was consistent with Mary's head being struck while resting on the floor and was not consistent with Mary falling down steps and striking the floor. Papers found on the floor and on Mary had no bloodstains, which indicated the papers were not present during the bloodshed. Hooks was also asked to determine whether the bloodstain on a

headboard in a bedroom was consistent with Mary being struck in the face. While Hooks agreed that this spatter was consistent with Mary being struck or blood being forced out of Mary's airway, Hooks could not distinguish whether the stain was an "impact" spatter, a "cessation cast-off" spatter, or aspirated blood.

¶ 56    Country Club Hills police officer Demere Terry testified that, on December 30, 2013, he went to the residence pursuant to a search warrant to recover the clothing Mary wore in the casino footage. In the master bathroom, he observed dark jeans, a "reddish" shirt, and a "purplish" bra hanging on a shower rack, which he photographed and recovered. In the kitchen, he observed a yellow rubber glove with a red substance on it, which he photographed and recovered. Terry observed a reddish substance on the ceiling of the stairway leading to the dining room, which he photographed and took samples from. He also observed a reddish substance on the base of the nightstand next to the master bed and on a mug on a shelf next to the master bed, which he photographed. A black candleholder in the entryway with hair on the base and a pedestal were also recovered. Terry looked inside the city-issued garbage can outside the residence and observed a silver "metal-type rod," which was photographed and recovered.

¶ 57    During cross-examination, Terry acknowledged that he did not know whether the garbage can was secured at the beginning of the investigation or how the rod came to be in the can.

¶ 58    The State entered several stipulations establishing that blood was indicated on the candleholder, the broken glass from the foyer, the yellow glove, and swabs from the headboard, the washing machine, and one section of the pedestal. A blood standard from Mary and the buccal swab from Taft were preserved for DNA analysis. A forensic scientist would testify that Mary's DNA was identified in swabs taken from the headboard, the candleholder, the face of the washing machine, a piece of the pedestal, and broken glass from the foyer. Swabs from the lid of the

washing machine indicated a mixture of two people's DNA, that of Mary and a minor DNA profile from which Taft could not be excluded. Finally, Mary's left-hand fingernail sample tested positive for a mixture of DNA profiles originating from three males, and Taft could not be excluded from having contributed to this mixture.

¶ 59    The trial court found Taft guilty of first degree murder, noting that several witnesses testified that Taft stated that he did not "do divorce" and that Mary said Taft told her that the only way she would leave him was "in a bag." Mary also told friends that, if anything happened to her, they needed to "look at" Taft. Additionally, the blood pattern on the headboard was consistent with Mary being struck, and, in the 911 call, Taft stated that Mary had fallen and could not wake and that a column also fell. The court noted that Taft only could have known that Mary fell if he was present when she fell. However, the autopsy concluded that Mary did not fall. The court found that the 911 call placed Taft in the home at the time of Mary's death, which was a homicide.

¶ 60    Taft filed a motion and amended motion for a new trial arguing, as relevant here, that the trial court erred by admitting Mary's statements pursuant to the doctrine of forfeiture by wrongdoing. After argument, the trial court denied Taft a new trial.

¶ 61    A presentence investigation (PSI) report stated that Taft had no criminal background, was raised in a two-parent home, and described his childhood as "okay." Taft had three children, had completed an associate degree, and was previously employed. He had one prior domestic battery arrest involving "his wife," but the case was nol-prossed.[6] Taft enjoyed reading and traveling, and he was a regular churchgoer. He suffered from hypertension, headaches, and pain due to a motorcycle accident.

---

[6] The PSI does not indicate whether the wife in question was Mary.

¶ 62    At sentencing, Williams read the victim impact statement of Mary and Taft's son, which stated that Mary's death caused stress and "extreme sadness" and that growing up without her was "heart breaking." Williams then read a statement from Mary's family, which stated that Taft took both parents from the children, seven members of the family were needed to provide the "core nucleus" for the children, and the cycle of domestic abuse must stop.

¶ 63    In mitigation, Taft's pastor testified that he and Taft were cousins and had grown up together. Taft began working after high school, had a "very close" relationship with Mary, and was proud of their children. Taft's aunt testified that Taft was respectful, that he and Mary "appeared to be a loving couple," and that he took care of his children and his mother. Another of Taft's cousins testified that Taft helped to shape his life, parented in a "positive manner," and engaged in charity work. A third cousin testified that Taft was a supportive family member who was "nice" to his children. The defense also presented numerous letters in support of Taft.

¶ 64    In allocution, Taft stated that he loved Mary, would never hurt the mother of his children, and had already "lost everything." Taft was sorry for Mary's family's pain, but he was also in pain because he lost his wife.

¶ 65    The court stated that it considered the evidence at trial, the PSI, and the arguments in aggravation and mitigation, as well as Taft's statement. In aggravation, the trial court noted that "defendant caused serious harm or injury, in this case death," and that it was necessary to deter others from committing a similar offense. In mitigation, the court noted that Taft was philanthropic, employed, religious, and without a criminal background. Although Taft's "character and attitude" made it unlikely that he would reoffend, "the act perpetrated upon Mary *** was reprehensible," "unacceptable," and "inexcusable." Due to Taft's actions, divorce proceedings that might otherwise have been resolved like any other instead resulted in his incarceration. The court

characterized "everyone" in the courtroom as a victim and noted that Taft had "robbed society" of Mary, who was a sister, an aunt, a mother, and Taft's wife. The court sentenced Taft to a prison term of 25 years.

¶ 66    In addition to the term of imprisonment, the trial court stated that Taft would be subject to a three-year term of MSR upon his release. Defense counsel interjected, "Excuse me, your Honor, I believe it's five years." The court thanked counsel and clarified that the MSR term would be five years.

¶ 67    Taft filed a motion to reconsider sentence alleging, in relevant part, that the trial court improperly considered, in aggravation, matters that were "implicit" in the offense. The trial court denied the motion.

¶ 68                                    ANALYSIS

¶ 69                          I.  Forfeiture by Wrongdoing

¶ 70    On appeal, Taft first contends that he was denied a fair trial when the trial court improperly admitted numerous hearsay statements attributed to Mary pursuant to the doctrine of forfeiture by wrongdoing. He argues that the State did not meet its burden to prove, by a preponderance of the evidence, that he killed Mary in order to prevent her from testifying in the divorce proceeding. Rather, Taft asserts that the State's evidence merely showed a "general philosophical or moral opposition to divorce" and not a "specific" intent to prevent Mary from testifying in divorce proceedings.

¶ 71    Pursuant to the sixth amendment to the United States Constitution, in all criminal prosecutions, a defendant has the right "to be confronted with the witnesses against him." U.S. Const., amend. VI. However, under the common-law doctrine of forfeiture by wrongdoing, "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to

confrontation." *Davis v. Washington*, 547 U.S. 813, 833 (2006). The doctrine is codified in Illinois Rule of Evidence 804(b)(5) (eff. Jan. 1, 2011), which provides that "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is not excluded by the hearsay rule. Thus, the forfeiture-by-wrongdoing doctrine is an exception to the confrontation clause and the rule against hearsay. *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 48.

¶ 72 Our supreme court has held that "a defendant forfeits his ability to challenge the reliability of the declarant's statements by the very act of preventing the declarant from testifying," such that "requiring additional indicia of reliability would undermine the equitable considerations at the very center of the forfeiture by wrongdoing doctrine." *People v. Peterson*, 2017 IL 120331, ¶ 33. Accordingly, so long as a declarant's statements are relevant and otherwise admissible, statements admitted pursuant to the doctrine of forfeiture by wrongdoing need not be shown to reflect additional indicia of reliability. *Id*.

¶ 73 "[T]he State's burden of proof in a hearing on forfeiture by wrongdoing is a preponderance of the evidence." *People v. Stechly*, 225 Ill. 2d 246, 278, (2007). The preponderance standard is less stringent than proof beyond a reasonable doubt or even the intermediate standard of clear and convincing evidence. *Peterson*, 2017 IL 120331, ¶ 37. "Under the preponderance standard, the State need only present evidence that renders a fact more likely than not." (Internal quotation marks omitted.) *Id.* "Thus, in a forfeiture hearing, the State must establish that [the] defendant, more likely than not, 'engaged or acquiesced in wrongdoing' and that such wrongdoing was 'intended to, and did, procure the unavailability of the declarant as a witness.' " *Id*. (quoting Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011)). A defendant's intent may be shown from his conduct and the surrounding circumstances. *Id*. ¶ 43. For the doctrine of forfeiture by wrongdoing to apply, the

evidence must show that the defendant engaged in witness tampering or some type of conduct designed to prevent the witness from testifying, thwart the judicial process, or procure the witness's absence from trial. *In re Rolandis G.*, 232 Ill. 2d 13, 40 (2008). However, "the State need not identify the specific testimony [the] defendant wished to avoid in order to prove *** intent for purposes of the forfeiture by wrongdoing doctrine." *Peterson*, 2017 IL 120331, ¶ 43.

¶ 74 We review a trial court's decision to admit evidence pursuant to the forfeiture by wrongdoing doctrine under the manifest weight of the evidence standard. *Id.* ¶ 39. A finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented. *Id.*

¶ 75 *Peterson* is instructive. There, the defendant argued that the trial court erred in allowing the State to introduce hearsay statements of his third ex-wife, Kathleen Savio (Kathleen), and his fourth wife, Stacy Cales (Stacy), under the forfeiture-by-wrongdoing doctrine. *Id.* ¶¶ 11, 36.

¶ 76 Kathleen was found dead in her own bathtub of what authorities initially deemed to be an accidental drowning. At the time of her death, her marriage to the defendant had been dissolved and he had married Stacy, but the proceedings had not concluded and custodial and financial issues had not yet been resolved. *Id.* ¶¶ 4-7. Several years later, Stacy was reported missing by a family member, but the defendant asserted Stacy left him and their children due to marital issues. *Id.* ¶ 8. Shortly thereafter, Kathleen's body was exhumed for a second autopsy, which concluded that her death was actually a homicide. *Id.* The defendant was then indicted for the first degree murder of Kathleen. *Id.* ¶ 9.

¶ 77 Before trial, the State moved to admit various statements made by both Kathleen and Stacy under the forfeiture-by-wrongdoing doctrine. *Id.* ¶ 16. At the forfeiture hearing, the State theorized that the defendant murdered Kathleen to prevent her from testifying at a divorce hearing. *Id.* ¶ 45.

The evidence revealed that the defendant and Kathleen were involved in an "acrimonious" dissolution proceeding. *Id.* Although the marriage was dissolved, custody, child support, maintenance, and the division of property were still at issue, and Kathleen would have testified at an upcoming hearing. *Id.* ¶¶ 4, 45, 46. Six weeks before her death, Kathleen told her sister to take care of her children if anything happened to her. *Id.* ¶ 45. Additionally, the defendant asked a friend if he knew anyone who could have the defendant's " 'third wife [Kathleen] taken care of.' " *Id.* ¶ 47. The State presented further evidence establishing that, because Kathleen died, the pending financial and custody issues were resolved in the defendant's favor; that is, he received custody of the minor children and the proceeds of Kathleen's life insurance policy as the children's guardian. *Id.* ¶ 48.

¶ 78 The State further theorized the defendant murdered Stacy to prevent her from reporting his involvement in Kathleen's murder or testifying at an anticipated divorce hearing. *Id.* ¶ 52. The evidence revealed Stacy was planning to file for divorce and that the defendant acknowledged their marital difficulties and was concerned about the financial impact of a divorce. *Id.* ¶¶ 72-74. The State presented further evidence that Stacy was afraid of the "control" the defendant had over her life and did not believe she could leave him safely but would not leave without her children. *Id.* ¶ 70. Additionally, Stacy told her pastor that, on the night of Kathleen's death, the defendant left their home and was unreachable on his phone, put his outfit and women's clothing in the washing machine, and "coached" her on what to tell the police. *Id.* ¶ 71.

¶ 79 The trial court found this evidence admissible pursuant to the forfeiture-by-wrongdoing doctrine. Following a jury trial, the defendant was found guilty of Kathleen's murder. On appeal, the defendant contended, as relevant here, that the trial court improperly admitted certain hearsay statements pursuant to the forfeiture-by-wrongdoing doctrine.

¶ 80    Our supreme court found that the trial court's finding that the statements of Kathleen and Stacy were admissible under the forfeiture-by-wrongdoing doctrine was not against the manifest weight of the evidence. *Id.* ¶¶ 51, 75. The court found that the State was not required to show that the defendant's "sole intent" in murdering Kathleen was preventing her from testifying at a hearing in the bifurcated divorce hearing; rather, the State was only required to prove that Kathleen's murder was motivated " 'at least in part' " by an intent to prevent her from testifying. *Id.* ¶¶ 44, 50 (quoting *Stechly*, 225 Ill. 2d at 272). The court therefore concluded that the trial court's determination that the State met its burden, by a preponderance of the evidence, that the defendant murdered Kathleen in order to prevent her from testifying was not unreasonable or not based on the evidence presented. *Id.* ¶ 51.

¶ 81    As to Stacy, our supreme court related that the evidence surrounding her unavailability included her desire for a divorce, the defendant's acknowledgment of this desire and his concern about the financial impact of a divorce, and Stacy's knowledge about the defendant's involvement in Kathleen's death. *Id.* ¶¶ 52, 73. Given that, our supreme court found that the trial court's determination—that the State established by a preponderance of the evidence that the defendant murdered Stacy, "at least in part with the intent" to prevent her from reporting the defendant's involvement in Kathleen's death or testifying in a divorce hearing or a murder trial—was not against the manifest weight of the evidence. *Id.* ¶ 75. In other words, the trial court's finding as to the defendant's intent was not unreasonable, arbitrary, or not based on the evidence. *Id.*

¶ 82    Similarly, here, the trial court's finding that Taft had engaged in wrongdoing with an intent to cause the unavailability of Mary as a witness in the divorce proceeding was not against the manifest weight of the evidence. The facts presented at the forfeiture hearing revealed that, before her death, Mary told family members, friends, and colleagues that Taft did not "do" divorce, that

he had refused to accept service of the divorce papers, and that, if anything happened to her, to "look at" Taft. Mary told Appleby that, after she filed for divorce, Taft said that, if the divorce happened, something would happen to Mary. Likewise, Mary told Butler that Taft did not believe in divorce and the only way she would leave him was in death. Additionally, Mary wrote in her diary that she told her family about the divorce "in the event Taft decides to harm me because I'm divorcing him," and that she cancelled Taft's bank card in December 2013 because she was tired of paying all the bills and he did not contribute.

¶ 83    The evidence presented at the forfeiture hearing thus showed that Mary was pursuing a divorce and canceled Taft's bank card. It also showed that, although Taft called 911 to state that Mary was unconscious due to a fall, Mary's autopsy revealed that her injuries were inconsistent with a fall and her death was caused by blunt trauma. Viewing this evidence together, we cannot say that the trial court's finding that Taft killed Mary at least in part with an intention to prevent her from proceeding with, and testifying in, the dissolution proceeding was unreasonable, arbitrary, or not based on the evidence presented at the hearing.

¶ 84    Taft asserts that the State's evidence merely showed that he had a general philosophical or moral opposition to divorce. However, the State established that Mary told Appleby that Taft told Mary that if the divorce happened, something would happen to Mary. Further, Mary told Butler that Taft did not believe in divorce and the only way she would leave Taft would be in death. This evidence showed more than a general opposition to the concept of divorce; rather, it supported a finding that Taft opposed this particular divorce and wanted it to stop.

¶ 85    Although Taft asserts that the State needed to establish that his "specific intent" was to prevent Mary from testifying in the dissolution proceeding, our supreme court has held that motive and intent are "rarely proved by direct evidence"; rather, they are inferred from conduct and the

surrounding circumstances. *Id*. ¶ 43. In the case at bar, the State's evidence at the forfeiture hearing established that Taft was unhappy that Mary filed for divorce, refused to accept service of the dissolution petition, and stated that he did not "do" or believe in divorce. He told Mary that she would only leave the marriage in death, and something would happen to her if the divorce happened. Further, the State highlighted that Taft's statement on the 911 call that Mary fell was not supported by the autopsy's findings.

¶ 86    Taft further asserts that in order to invoke the doctrine of forfeiture by wrongdoing, the State must identify "specific consequences emanating from potential trial testimony." However, our supreme court has determined that no evidentiary requirement mandates that the State identify "the specific testimony the defendant sought to avoid." *Id.* ¶ 42.

¶ 87    Accordingly, the trial court's determination that the State established by a preponderance of the evidence that Taft killed Mary in order to prevent her from pursuing and testifying in the divorce proceeding was not against the manifest weight of the evidence. *Id.* ¶ 75.

¶ 88             II. Consideration of an Aggravating Factor Implicit in the Offense

¶ 89    Taft next contends that the cause should be remanded for resentencing because the trial court improperly relied on a factor inherent in the offense of first degree murder—Mary's death—at sentencing. He argues that it was improper for the trial court to specifically mention in aggravation that Taft caused "serious harm or injury, in this case death."

¶ 90    The parties disagree as to the standard of review for Taft's claim. Taft argues the proper standard is *de novo*, while the State argues the proper standard of review is abuse of discretion. The imposition of a sentence is generally within the trial court's discretion, and we will not alter a sentence imposed by the trial court absent an abuse of that discretion. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8. However, whether a court relied on an improper factor in aggravation

when imposing sentence is a question of law that we review *de novo*. *Id*.; *People v. Phelps*, 211 Ill. 2d 1, 12 (2004). We presume the trial court based its sentence on proper legal reasoning, and a defendant has the burden to "affirmatively establish" the sentence was based on an improper consideration. *People v. Dowding*, 388 Ill. App. 3d 936, 942-43 (2009).

¶ 91 When determining an appropriate sentence, the trial court must weigh both aggravating and mitigating factors. See 730 ILCS 5/5-5-3.1, 3.2 (West 2012). It is presumed, absent evidence to the contrary, that the court considered those factors when presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶¶ 19-20. Moreover, a sentence that is within the prescribed statutory range is presumed to be appropriate and will not be deemed excessive unless it varies greatly from the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense. *People v. Fern*, 189 Ill. 2d 48, 54 (1999).

¶ 92 Nonetheless, "a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense." *Phelps*, 211 Ill. 2d at 11. This is because we assume the legislature took into account the factors inherent in an offense when determining the appropriate range of punishment. *People v. Gonzalez*, 151 Ill. 2d 79, 84 (1992). Therefore, the trial court's use of one of those factors as the basis for a harsher penalty than might otherwise be imposed constitutes an improper double use of the single factor. *Id*.

¶ 93 This rule is not intended to be applied rigidly because sentences vary depending upon the circumstances of a particular case. *People v. Valadovinos*, 2014 IL App (1st) 130076, ¶ 47. Accordingly, when determining whether improper factors were considered, we focus on the entire record as opposed to a few words or statements made by the sentencing court. *Id*. "Even if the sentencing court mentions the improper fact, a defendant must show the court relied on the

improper fact when imposing its sentence." *Id*. For the following reasons, Taft cannot make that showing here.

¶ 94    A sentence that falls within the statutory range is presumed proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. Here, Taft was found guilty of first degree murder and was therefore subject to a sentencing range of 20 to 60 years in prison. 730 ILCS 5/5-4.5-20(a) (West 2012). Taft's 25-year sentence was within the sentencing range and is, therefore, presumed to be proper. *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 95    Taft argues that it was improper for the trial court to consider the serious harm to the victim as a factor in aggravation. He contends that because causing the death of another is an element of first degree murder, serious harm is an inherent factor of the offense. However, section 5-5-3.2 of the Unified Code of Corrections provides that a sentencing court may consider certain factors as reasons to impose a more severe sentence, including whether "the defendant's conduct caused or threatened serious harm." 730 ILCS 5/5-5-3.2(a)(1) (West 2012). When balancing the "retributive and rehabilitative purposes of punishment," the trial court must carefully consider "all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, *** general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 96    Based upon our review of the record as a whole, we find that while the trial court did note in aggravation that "defendant caused serious harm or injury, in this case death," it did so while mentioning the manner and circumstances of Mary's death. That is, the court explained that although Taft's "character and attitude" made it unlikely that he would reoffend, "the act perpetrated upon Mary *** was reprehensible," "unacceptable," and "inexcusable;" due to Taft's

actions, divorce proceedings that might otherwise have ended like any other resulted in his incarceration. See *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 94 (the seriousness of the offense is the most important factor in sentencing); *People v. Kibayasi*, 2013 IL App (1st) 112291, ¶¶ 56-58 (finding no error in sentencing where the trial court's comments regarding the victim's death referenced the manner and circumstances of the victim's death rather than the death itself as an aggravating factor).

¶ 97    Moreover, the trial court then stated that a prison term was necessary to deter others from committing the same offense, recited the mitigating evidence, and concluded that Taft was unlikely to reoffend. The court then characterized everyone in the courtroom as a victim. See *People v. Brown*, 2019 IL App (5th) 160329, ¶ 22 ("Section 5-5-3.2(a)(1) does not state that the serious harm to be considered is restricted to the serious harm to the victim, and we decline to judicially recraft the plain language of the section."). Accordingly, based upon our review of the entire record, Taft has failed to show that the trial court relied on an improper factor when imposing sentence. See *Valadovinos*, 2014 IL App (1st) 130076, ¶ 47.

¶ 98    Further, taken in context, the court's comment was general in nature and made in passing.

¶ 99    In *People v. Brewer*, 2013 IL App (1st) 072821, the defendant argued that the trial court erred when it considered a factor inherent in the offense of murder when sentencing him. There, the trial court stated, " 'Factors in aggravation, the defendant's conduct did cause or threaten serious harm, the ultimate serious harm, murder.' " *Id*. ¶ 56. We found that the record did not indicate that the trial court emphasized a factor inherent in the offense. *Id*. ¶ 57. Rather, "[c]ontrary to [the defendant's] assertions, the fact his conduct threatened or caused serious harm is not a factor inherent in the crime itself but is a proper aggravating factor to be considered during sentencing even in cases where serious bodily harm is implicit in the offense." *Id*. Additionally,

the defendant's sentence was within the statutory sentencing range for first degree murder, and the existence of mitigating evidence did not mandate the imposition of the minimum sentence or foreclose the imposition of the maximum sentence. *Id.*

¶ 100   Similarly, here, the fact that the trial court noted that Taft's conduct caused serious harm was a proper aggravating factor to be considered at sentencing even in a first degree murder case. *Id.* Moreover, the trial court noted the evidence in mitigation and that Taft was unlikely to reoffend, but it found that a sentence was warranted to deter similar offenses and imposed a sentence only five years above the statutory minimum. See *Quintana*, 332 Ill. App. 3d at 109 (when balancing retribution and rehabilitation, the trial court must carefully consider "all factors in aggravation and mitigation" including, *inter alia*, the defendant's age, "moral character," and "the nature and circumstances of the crime and [his] conduct in the commission of it"). Therefore, Taft has failed to establish that his sentence was based on an improper consideration and his argument must fail. See *Dowding*, 388 Ill. App. 3d at 942-43.

¶ 101                                III. MSR Term

¶ 102   Taft finally contends, and the State agrees, that the trial court improperly imposed a five-year MSR term when the relevant statute states that the term of MSR for first degree murder is three years. Pursuant to section 5-8-1(d)(1) of the Code of Corrections (730 ILCS 5/5-8-1(d)(1) (West 2012)), the term of MSR for first degree murder is three years. We therefore order the mittimus corrected to reflect a three-year MSR term.

¶ 103                                CONCLUSION

¶ 104   For the foregoing reasons, we order the mittimus to be corrected to reflect a three-year term of MSR and affirm the judgment of the circuit court in all other aspects.

¶ 105   Affirmed; mittimus corrected.